JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
DNV Investment Partnership, Dale Menard, S. Eugene Mathis, Jr. and Kenneth A. Grissom, on behalf of themselves and all others similarly situated

(b) County of Residence of First Listed Plaintiff  Shelby
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Richard L. Gaines  550 main St Ste 900
Daniel, Harp & Gaines  Knoxville TN 37902
(865) 546-4292

## DEFENDANTS
Regent Private Capital, LLC, Regent Private Capital II, LLC, Premier Natural Resources, LLC, Charles Stephenson, Lawrence Field

County of Residence of First Listed Defendant  Tulsa County, OK
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: 28 U.S.C. § 1332(a)

Brief description of cause: Fraudulent Misrepresentation

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 27,430,000.00   CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE April 2, 2014   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE

DNV INVESTMENT PARTNERSHIP,        )
DALE MENARD, S. EUGENE MATHIS, JR.,  )
AND KENNETH A GRINSPUN, ON BEHALF  )
OF THEMSELVES AND ALL OTHERS        )
SIMILARLY SITUATED,                 )
                                             )   **CLASS ACTION**
     Plaintiffs,                        )
                                             )
vs.                                 )   **NO. _____**
                                             )   **JURY DEMANDED**
REGENT   PRIVATE   CAPITAL,   LLC,   )
REGENT PRIVATE CAPITAL II, LLC,      )
PREMIER  NATURAL  RESOURCES,  LLC,   )
CHARLES STEPHENSON, AND             )
LAWRENCE FIELD,                     )
     Defendants.                        )

## COMPLAINT FOR FRAUDULENT MISREPRESENTATION AND CONCEALMENT, NEGLIGENT SUPERVISION, BREACH OF FIDUCIARY DUTY, FRAUD AND WIRE FRAUD

       Plaintiffs, on behalf of themselves, and all other similarly situated investors/class members, by and through their below signed counsel, bring the following complaint against the defendants,  Regent Private Capital, LLC, Regent Private Capital II, LLC, Charles Stephenson and Lawrence Field, and respectfully allege as follows:

I.     **THE PARTIES**

### Plaintiffs:

     1.       DNV Investment Partnership is a Tennessee entity with its principal place of business at 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.  All partners

1

are residents of Tennessee and the Managing Partner is Justin Van Menard with a mailing address of 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.

2.     Kenneth A. Greenspun is a Tennessee resident with a mailing address of PO Box 38264 Germantown, TN  38183.

3.     S. Eugene Mathis, Jr. is a Tennessee resident with a mailing address of 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.

4.     Dale Menard, who invested through his IRA, is a Tennessee resident with a mailing address of 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.

**Defendants.**

5.     Defendant Regent Private Capital LLC ("Regent") is an Oklahoma limited liability company with its principal place of business at 5727 S. Lewis Street, Tulsa, Oklahoma 74105.

6.     Defendant Regent Private Capital II LLC ("Regent II") is an Oklahoma limited liability company with its principal place of business at 5727 S. Lewis Street, Tulsa, Oklahoma 74105 and is the successor in interest to Regent.

7.     Defendant Charles Stephenson ("Stephenson") is the founder and a managing director of Regent and the founder and Chairman of the Board of Premier and, upon information and belief, is a resident of Oklahoma.

8.     Defendant Premier Natural Resources, LLC, is an Oklahoma limited liability company with its principal place of business at 5727 S. Lewis Street, Tulsa, Oklahoma 74105

2

9.     Defendant Lawrence Field ("Field") is the co-founder and a managing director of Regent and, upon information and belief, is a resident of Oklahoma.

## II.     JURISDICTION

10.     This Court has jurisdiction over this action pursuant to (1) 28 U.S.C §1332(a) as Plaintiffs' claims exceed $75,000 and the residences of Plaintiffs are diverse from Defendants;  (2) the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715 because the amount in controversy exceeds $5 million and there is diversity among more than two thirds of the plaintiff class members and the defendants, and (3)18 U.S.C. Section 1843, Wire Fraud.

## III.     FACTUAL BACKGROUND

11.     During the time relevant to this complaint, Regent described itself on its web site as "a private family investment fund," with "a diversified portfolio of investments in the Oil and Gas" sector and other sectors.

12.     During the period relevant to this lawsuit, Regent referred to itself several times on its web site as a "family office" and a "family ... fund." The family it references is the Stephenson family of Tulsa, Oklahoma.

13.     When the events described in this complaint occurred, Charles Stephenson was described on the website as the founder and a managing director of Regent.

14.     Lawrence Field is Stephenson's son-in-law and, according to the Regent web site, Stephenson "oversees [Regent's] management and investment activities" and Field "is actively involved" in the firm's investment decisions and directly

supports the growth of member portfolio companies.  Field has signed correspondence describing his role in this matter as, "The Managing Director of Regent Private Capital, LLC."

15.     In a public SEC filing for the period ending January 31, 2013, Regent identified itself as liquidating and dissolving and identified Regent II as a successor in interest. Upon information and belief, this was done to hide and protect financial assets.

16.     Stephenson has had a long and successful career in the oil and gas industry. From 1973 to 1982, he was an owner and the President of Andover Oil Company. In 1983, he founded Vintage Petroleum, Inc., which he took public in 1990 and sold to Occidental Petroleum in 2006.

17.     After selling Vintage Petroleum, Inc. for $4.3 billion, Stephenson founded Premier Natural Resources, LLC, ("Premier"). Stephenson is the Chairman of the Board of Premier. On information and belief, Stephenson owns all or a majority of the interests in Premier.

18.     Premier is a private oil and gas exploration and production-company, that operates oil and gas wells in Louisiana, Mississippi, and Texas.

19.     Premier is a partner with Kohlberg Kravis Roberts & Co. L.P. ("KKR") in pursuing investments in North American oil and gas properties.

20.     Through its partnership with KKR, Premier describes its mission as follows: "to invest capital in producing North American assets with significant upside potential and develop new reserves of domestic energy."

4

21.     Regent and Premier share office space (including conference rooms) and a telephone system, and Field and Stephenson work out of a shared executive suite. Telephone calls from Regent's main telephone number are identified on "caller ID" as coming from Premier.

22.     Reed Energy, LLC and Reed Energy Exploration, Inc. (hereinafter, "Reed") were formed at the direction of Metropolitan Equity Partners, LLC ("Metropolitan") for the purpose of investing in the oil and gas drilling rights/operations, as described herein.

23.     Metropolitan is a New York City-based investment manager that provided investment advice and equity services to plaintiffs and class members.

24.     Metropolitan EIH13, L.P. ("Met13") is a Delaware limited partnership formed in 2011 by Metropolitan to solicit and facilitate plaintiffs' and class members' purchases of limited partnership interests in Met13. Metropolitan serves as the management company of Metl3.

25.     Reed is a majority-owned subsidiary of Met 13 that was formed to exploit the oil and gas "opportunity" promoted by the Defendants.

26.     Met13 solicited and received funds from plaintiffs and class members it then used, in part, to make a secured first lien debt investment and purchase an equity interest in Reed, which is the entity that acquired some of the oil and gas drilling rights and operations described below. Other oil and gas drilling rights and operations described below were acquired by Reed's majority- owned subsidiary, Northeast Fuel, Inc. (NFI).

**Regent Presents to Metropolitan the Fraud Based Oil Investment Opportunity**

27.    In 2009, SGM Holdings, LLC ("SGM"), an entity formed by Syndicated Geo Management, Inc., obtained an option in what was purported to be 171 shallow gas wells (the "Shallow Operation") in Washington, Meigs, and Galia Counties in Ohio from Bobby Anderson and his wife, Marjorie Anderson (the "Andersons").

28.    After two years of failed attempts, SGM (and its predecessor) were unable to raise the capital necessary to exercise the option and develop and work the Shallow Operation.

29.    In 2011, SGM approached Regent to solicit the necessary capital to complete the project.

30.    Instead of investing its own capital, Regent, in May 2011, suggested to Metropolitan that it raise the capital to invest in the Shallow Operation.

31.    Field, representing the other Defendants, approached Metropolitan and described the proposed venture as an opportunity to acquire shallow gas and oil wells that had not been adequately maintained and exploited due to the death of the former owner's son 10 - 15 years earlier. Field/Defendants further represented that, with a strategic investment of new capital in the Shallow Operation, it could produce $10 - 20 million of EBITDA (earnings before interest, taxes, depreciation, and amortization) per year, according to diligence and calculations made by Regent in reliance on "the technical resources, employees and expertise of Premier."

32.    Regent does not employ any oil and gas experts, petroleum engineers or geologists, but Field said that Regent was accessing competent resources

6

from Premier, which Field represented was controlled by Stephenson and him, just as Regent was controlled by Stephenson and him.

33.     Field convinced Metropolitan that, separately, an investor could also acquire rights to the oil and gas in the Utica Shale, below the Shallow Operation (the "Deep Rights"), and that the Deep Rights could be resold almost immediately, through Regent, using its and Premier's contacts/and relationships, for a significant profit over and above the initial investment.

34.     Field convinced Metropolitan that Defendants would (a) attract and provide formal oversight of top-tier service providers who could maximize cash flow from the Shallow Operation and (b) attract top-tier purchasers for a quick sale of the Deep Rights. Field spoke frequently of the many relationships Stephenson and he had with high level persons at major oil and gas companies and said he was personally acquainted with potential buyers of the Deep Rights who would have a strong interest in acquiring them.

35.     Field portrayed himself and Regent as uniquely able to bring this promised package together with his significant experience, expertise, and relationships throughout the oil and gas industry.  Field routinely spoke and wrote emails utilizing "we" and "our" in contexts where it was plain that he was referring not just to Regent, but also to Stephenson and Premier. These representations were made to Metropolitan and directly to plaintiffs and class members in meetings, emails, and phone calls.

36.     Field repeatedly spoke of the success of Stephenson and Premier, describing Premier as part and parcel of the Regent team and as a separate entity in

7

name only. These representations were made to Metropolitan and directly to class members in meetings, emails, and phone calls.

37.     Field alleged that Regent, Premier, Stephenson, and he were precluded from investing in the opportunity presented by SGM because of the partnership between Premier and KKR or the Defendants would have invested in the combination of the Shallow Operation and Deep Rights themselves.

38.     Metropolitan, plaintiffs, and class members reasonably believed and relied upon Field's representations that he had the authority to speak on behalf of Regent, Premier, and Stephenson.   He portrayed Stephenson as overseeing the management and investment activities of Regent and as being "actively involved" in the company's investment decisions. Metropolitan, plaintiffs, and class members also relied on Field's representations in making decisions regarding the venture and relied on Field's assurances that he could deliver Defendants' expertise, experience and relationships in support of the venture.

39.     Metropolitan, plaintiffs, and class members reasonably believed that Field had the authority to speak on behalf of Premier based on Field's statements to that effect and his numerous representations that he attended meetings with KKR and other entities associated with Premier. He also shared offices, telephone system and ownership of Regent and Premier. He assured Metropolitan and class members that Stephenson was the person ultimately in charge of both companies. Field demonstrated significant personal knowledge of Premier activities, disclosing confidential details of future Premier acquisitions which later proved accurate according to published transaction details.

40.     Field intentionally misled Metropolitan and Met13 investors to believe that Stephenson and Premier's expertise, experience, and relationships in the oil and gas industry had been used to complete the diligence on the Met13 venture and would be available to Metropolitan and its investors.

41.     Given its lack of experience with oil and gas, Metropolitan would not have even considered promoting the venture to the plaintiffs and class members absent the repeated assurances by Field that Stephenson and Premier, trusted by KKR, would also be partnering with Metropolitan on Met13, Metropolitan's first oil and gas venture.

42.     Field told Metropolitan that all that was required for financial success in the Shallow Operation  was the capital, to be raised by Metropolitan, and the experience, expertise, resources, and assistance of Regent and Premier.  Further, Field represented that he and Regent would provide the oil and gas knowledge needed to sell Met13 securities directly to investors (plaintiffs and class members).

43.     In promoting the Deep Rights, Field represented that all that was required for a successful investment were the pre-qualified buyers with whom Regent, Premier, Field, and Stephenson had existing relationships.  He described the Deep Rights as comparable to other acreage in the Utica Shale valued at a materially higher price. According to Field, the sale of the Deep Rights could easily be concluded with a personal call from Field or Stephenson to a handful of reputable oil and gas exploration and production companies.

**Defendants Fraudulently Edit the Bayswater Diligence Report**

44.     In June 2011, Regent arranged for Metropolitan to tour the Ohio property in the company of Bayswater Exploration and Production ("Bayswater").

45.     Regent recommended that Bayswater operate and manage the development of the Shallow Operation and represented that Bayswater was willing to participate in the venture.

46.     Given Bayswater's stature and acknowledged expertise in the oil and gas industry, its willingness to assume the management of the Shallow Operation was a major selling point for Met13.

47.     Based on its diligence and its negative assessment of the properties, Bayswater elected not to participate in the project. It also made clear in its "diligence" report that further diligence needed to be completed on the proposed project.

48.     Field knew that Bayswater walked away from the project because of its well-founded doubts about the financial success of the project, but fraudulently told Metropolitan that Bayswater walked away because Metropolitan's cost of capital was too high.

49.     Field also told Metropolitan that Bayswater wanted to do the project itself with its own resources, without Metropolitan, but that he "protected" Metropolitan and saved the deal for it.   Metropolitan relied, in part, on Bayswater's purported enthusiasm for the project in promoting the investment to the 57 limited partners/investors in Met13.

10

50.     In fact, based on its tour of the property, Bayswater had written a diligence memorandum reporting not only the positives, but also the significant negatives it saw in the deal.

51.     On September 11, 2011, Field shared the Bayswater memorandum with Metropolitan but only after intentionally removing all negative analysis from it, including significant operational issues and other information highlighting the complexity of the operation and the inability to extract value from it.  The Defendants, through Field, intentionally misled Metropolitan with the full knowledge that the fraudulent information would be passed on to and relied upon by the plaintiffs and class members. See, *Attachment A, The Redacted Bayswater Report with the Omitted Sections Highlighted.*

52.     Metropolitan thereafter generated a *Confidential Disclosure Memorandum* that contained the fraudulent information generated by Field on behalf of the Defendants.  See, *Attachment B, Confidential Disclosure Memorandum.*  Based on the misinformation contained in the *Memorandum,* Metropolitan raised $23,430,000 in capital from the Plaintiffs and other class members (Met 13) and expended this money purchasing and trying to manage the Ohio Properties. See, *Attachment C, List of Original Met13 Investors.*

53*.*     Each and every investor received and relied upon the *Confidential Disclosure Memorandum* in making the decision to invest in Met13.  Metropolitan did not receive the full, un-redacted Bayswater memorandum until February, 2013.

54.     The omitted information from the full Bayswater memorandum included:

- •       Issues relating to "casing leaks" on every wellbore in the deal;
- •       Quantification of abandonment costs for unproductive wells;

- The lack of geologic information, mapping, cash flow information and identification of active vs. inactive wells;
- A "tremendous" lack of technical information, such that the upside cannot be de-risked through study/technical work"; and
- Data indicating that current cash flow from the assets did not justify significant asset value, and that the "existing deal structure... doesn't fit the asset and opportunity."

55.    Field also removed a roadmap to further more complete diligence that would be required in the event that Bayswater continued with the project.

56.    Plaintiffs and class members (and Metropolitan) would not have moved forward had they had access to the complete Bayswater memorandum. The Defendants' fraudulent redacting of the Bayswater report and its false assertions regarding the reason that Bayswater walked away from the venture were the proximate cause of Plaintiffs' and the class members' losses.  But for the Defendants' fraudulent and deceptive conduct, there never would have been a Met13 limited partnership and none of its limited partners would have lost their investments.

57.    Field now claims that he doctored the Bayswater findings in response to a request from Metropolitan for a "headline summary" of the memorandum. However, a comparison of the full and edited memoranda makes plain that it was only the negative findings in the memorandum that Field omitted. See *Attachment D, Email from Lawrence Field/Regent detailing only positive information from the Bayswater Diligence Report.*

## The Proposed Deal Comes Together

58.     After Bayswater declined to participate, the project stalled for several months while Field/Defendants searched for a new operator.

59.     In the meantime, Chesapeake Energy Corporation ("Chesapeake"), the second largest gas producer in the United States, entered into a joint venture in the Ohio Utica Shale.

60.     Field portrayed the acreage that Chesapeake had acquired at $15,000/an acre as comparable to the acreage he was offering Metropolitan and its investors at a much lower price.

61.     Field had telephone conversations and met with many potential investors in Met13 on several occasions in or around November and December 2011 and repeated to them the representations already made to Metropolitan,  including representations relating to Premier's relationship with KKR and why it precluded Regent and Premier from doing the deal.  In Regent's name, he also touted the quality and potential profitability of the proposed investment.

62.     Field also read and approved of a Confidential Disclosure Memorandum  ("CDM") and gave Power Point presentations and other misleading information to potential  investors that referred to Regent as an "industry expert."  For example, the CDM stated:

> As of today, a small portion of the 171 producing wells are
> not fully functioning and the remainder are producing at sub-
> standard production levels due to a lack of ongoing
> investment in required capital expenditures and proper
> maintenance. While neglected ... diligence in conjunction
> with industry experts suggests that basic improvements may

result in a material increase in current production. Further, the diligence suggests that there are unproven but probably unexploited reserves on the acreage.

63.     The industry experts referred to in this portion of the CDM are Regent and Premier.

64.     Elsewhere in the CDM, Regent is specifically named as Metropolitan's "advisor on energy sector specific decisions." The CDM stated: "Regent will advise the Company prospectively on all energy sector specific decisions, including the sale of the deep drilling rights."

65.     Metropolitan committed to raising the capital to acquire and invest in the Shallow Operation and to purchase and hold, pending resale, the Deep Rights. Metropolitan created Met13, Reed Energy and Northeast Fuels, Inc. (NFI) as vehicles to carry out this two-pronged investment strategy.  Reed acquired the Deep Rights and NFI acquired the Shallow Operation, both in reliance on Defendants' misrepresentations that included:

(a)     With the investment of a relatively small amount of money to develop its potential, the Shallow Operation would produce consistent and substantial monthly EBIDTA (earnings before interest, depreciation, taxes, and amortization);

(b)     Defendants had identified a capable operator who could manage the Shallow Operation and deliver the promised result;

(c)     Defendants would oversee development and management of the Shallow Operation;

(d)     the Deep Rights in the Utica Shale underlying the Shallow Operation could be obtained for a price substantially below its actual value and almost

14

immediately sold at a higher price to buyers known to Regent/Premier and already waiting in the wings;

(e)    the value of the Deep Rights could be maximized if they were actually acquired by Reed and then sold in a "principal to principal" transaction, as opposed to simply "flipping" the Deep Rights Option Agreement, hence the need for and value in the money raised by Metropolitan from its investors; and

(f)    Defendants had already completed the diligence on the Deep Rights that would support the recommended investment.

### The Regent Fee Agreement.

66.    On January 4, 2012, Reed and Regent entered into the Regent Fee Agreement, pursuant to which Reed agreed to pay to Regent an aggregate of $1 million (the "Consulting Fee") in connection with services rendered by Regent relating to the transactions contemplated by the Mineral Rights Option Agreements.

67.    The first $500,000 of the Consulting Fee was payable upon the acquisition by Reed of the Deep Rights, with the first payment due upon the acquisition of 3,000 acres of Deep Rights and the remainder to be paid pro-rata as Reed acquired the first of 7,000 acres of additional Deep Rights.

68.    The second $500,000 of the Consulting Fee was to be paid to Regent, on a contingent basis, upon the sale of at least 3,000 acres of the Deep Rights to an unaffiliated third party if Regent was the procuring cause of such sale and such sale occurred at a price equal to or greater than $4,000 an acre.

69.     In conjunction with the Consulting Fee, Reed also sold to Regent a six percent fully-diluted equity interest in Reed (which was netted against the Consulting Fee).

70.     It was Field who first used of the term "arbitrage," in conjunction with the Deep Rights to signify a quick sale at a substantial premium over the purchase price. Field used and approved the use of the word in presentations and briefings to investors. Indeed, the concept of an "arbitrage" was a fundamental theme of all discussions between Field and Metropolitan and Met13 investors.

71.     To date, Reed has paid to Regent $410,917 under the Regent Fee Agreement. Reed has not paid Regent any additional monies for the reasons explained below.

### Discovery of Defendants' Fraudulent Misrepresentations and Gross Negligence

72.     Regent's stated strategy for Reed's business model had two primary components. The first component was to acquire up to 9,000 acres of leases in Washington, Athens, and Meigs Counties and almost immediately resell them to a buyer, known to Defendants, in a "principal to principal" transaction (Field's words) without the use of any intermediary. The second was to acquire about 6,000 acres of shallow rights and perform a "traditional work-over of an old field" that would drive cash flow and enterprise value.

73.     With regard to the Deep Rights, Field said that Regent' and Premier's relationships would not only open doors, but also maximize the price for the acreage. Field, on behalf of the Defendants, said that he could sell the land in the price

range of $3,000 to $5,000 per acre in a time frame of three to six months after the acquisition, false representations that Defendants, through Field, conveyed to Metropolitan and Metl3 investors.

74.   Defendants agreed to (1) deliver diligence services for the acquisition of both the Shallow Operation and Deep Rights; (2) retain all the required expertise and hands-on operators to complete the project and oversee their work in connection with the Shallow Operation; and (3) deliver top-tier buyers in a matter of months for the Deep Rights.

75.   Reed accepted Defendants' offer and agreed, in exchange, to enter into the Regent Fee Agreement and to sell Regent a six percent fully-diluted equity interest in Reed. Based on Defendants' representations and promises, Reed went forward with the purchase of the Deep Rights and NFI acquired the Shallow Operation.

### Defendants Do Not Do Any Diligence Work

76.   In late 2011, Field told Metropolitan that Regent had utilized the resources of Premier to validate the assets that were the subject of the Mineral Rights Option Agreements, but that Metropolitan could not access the diligence performed by Regent/Premier to share with its investors as that might be construed as advertising the Premier relationship with KKR, which was forbidden by KKR.

77.   As Field and the other Defendants well knew, Metropolitan did not conduct comprehensive diligence to independently confirm the details of the purported Regent/Premier diligence, as it had no expertise to do so. Instead, Metropolitan relied upon the representations made and services provided by Defendants in exchange for the generous compensation provided under the Regent Fee Agreement.

78.    Instead of sharing with Metropolitan the Regent/Premier diligence which Field represented had been done, Field invoked the Premier/KKR relationship which he represented required confidentiality and offered to, and did, speak directly to many of Metropolitan's investors, assuring them not only that the requisite due diligence on the assets had been successfully completed but also that the investment offered enormous potential for financial gain.

79.    Field appeared credible as he routinely pitched his ideas and understanding of the opportunity as not just his own, but the product of Defendants' significant expertise, experience, connections, and hard work and from knowledge gained by networking with potential buyers in the course of routine interactions with companies and individuals with which Premier had relationships.

80.    Defendants valued their "diligence" contribution at $2 million in a presentation Field made in May of 2011.   This false claim of a $2 million in kind investment was made with the intention of leading Metropolitan, Plaintiffs, and class members to invest and was a proximate cause of their losses.

81.    Unknown to Plaintiffs and class members, as well as Metropolitan, neither Regent nor Premier did any diligence work on the assets at issue in this lawsuit.

.    **The Deep Rights Acreage is Less Acreage than Regent Represented**

82.    Shortly after Reed acquired the option to purchase the Deep Rights and began to market them, it became apparent that Field was unable to bring any potential buyers to the table. In late March 2012, upon growing suspicion that Field, on behalf of the defendants, had been lying, Metropolitan asked Jason Henthorne, a Met13 investor and a trained geologist who has experience buying and selling oil and gas

properties and is one of Metropolitan's appointments to the Reed board, to review the situation.

83.    At the time Henthorne began conducting geological due diligence on the Deep Rights, Reed had not yet acquired 5,347 of the 9,000 optioned acres. Based on Henthorne's work, Reed determined that the 3,653 acres that had been acquired could not be profitably developed and, therefore, were substantially less marketable than Defendants represented. Henthorne also determined that 2,500 un-acquired acres in southern Washington, Meigs, and Athens Counties could not be profitably developed.   The remaining 2,847 un-acquired acres also could not be profitably developed and did not even present clear title.

84.    As a result of Henthorne's work, Reed successfully avoided purchasing many acres which Reed would have been unable to re-sell because there is no hope that they will be profitable.

85.    Unfortunately, Reed had already purchased 3,653 acres of Deep Rights when it learned that the Deep Rights, which Regent and Field had said could be quickly sold at a premium to buyers waiting in the wings, were essentially worthless and illiquid.

86.    In fact, The Defendants have not produced a single potential buyer for the Deep Rights. The best they have been able to do is to produce a list of energy companies identified through the kind of internet search anyone could do.

87.    With no assistance from Defendants and in an attempt to mitigate further harm, Reed has itself been actively pursuing the sale of the Deep Rights through a reputable publically traded investment bank.  Despite disseminating details about the

assets to over 300 potential buyers, Reed has not been able to generate any qualified, bona fide interest in the Deep Rights.

88.    Most buyers view the Deep Rights geology (and Southern Washington County, in general) to be "unproven," "thinning too rapidly," or "outside of the prospective Utica/Point Pleasant play," facts that would have become apparent to the Defendants had they done even cursory due diligence on the deep rights, let alone the "$2 million in diligence" they fraudulently claimed to have done.

89.    The acreage touted so enthusiastically by Defendants is actually south of the main Utica Shale play and not considered part of that development.

**The Shallow Operation Wells Are Mostly Abandoned, Nonproductive, or Producing Below Expectations and New Wells Cannot or Should Not Be Drilled.**

90.    The Met13 Loan Agreement, pursuant to which Reed was lent $17 million to acquire and begin to develop the Shallow Operation, as well as Met13 investor documents, required a development plan and budget for the Shallow Operation to be prepared prior to closing.

91.    Defendants delivered a written development plan and budget in March 2011 which Field represented was done in conjunction with someone knowledgeable in these types of operations: Larry Wise, who he said was experienced in oil production and improvement operations like those facing the shallow operation.

92.    However, it was not long after Wise took over managing the Shallow Operation that Reed began to suspect that he was not fit to run it. Wise failed to keep adequate records and spent unauthorized funds, and appeared to have inadequate knowledge of oil and gas operations.

93.     Reed asked Henthorne to review Wise's work in detail. Henthorne reported to Reed that he found Wise's work deficient and that he lacked local knowledge and a basic understanding of oil and gas operations.

94.     Defendants, through Field, disagreed with Henthorne, assuring Reed, both before and after   Henthorne's   review, that Wise had the requisite exploration and production skills and understood the business well and he made multiple diligence trips to Ohio prior to the acquisitions and had adequate access to the former owners.

### The Met13 entities try to salvage the investment.

95.     Wise was never able to adequately manage the Shallow Operation and had to be terminated on December 3, 2012.  At that point, Henthorne's family-owned oil and gas business, Petro Evaluation Services, LLC ("Petro"), took over control of the Shallow Operation.

96.     Petro discovered that of the 171 wells that Reed believed it was acquiring, 20 either cannot be found, as it appears they were abandoned decades earlier, or the leases have lapsed and the wells cannot be inspected.

97.     Of the remaining 151, 72 are not producing and Petro has concluded that they are not economically viable as the cost of bringing them back online exceeds any potential return from them. Another 49 wells are producing in such low quantities that the cost of running them exceeds what their current production yields.

98.     According to the Ohio Department of Natural Resources ("ODNR") regulations, these 141 wells must be plugged. The cost of plugging these wells will be about $2.5 - $3 million.

99.     The remaining wells are in poor condition, with minimal to no value in the equipment on location. With only a few exceptions, the production is very poor as most of the wells have either been in production for decades or possibly reworked to the point of exhaustion.

100.    The defendants also represented that there were approximately 100 locations where new wells could be drilled within the acreage obtained from the Andersons. Regent represented that these new wells were already permitted. Per Defendants' fictional original diligence, the first 40 in-field wells were projected to generate over $13 million in EBITDA.  Prior to closing on the acreage, Regent redrafted its initial projections for the drilling of 10 new wells that would produce oil and gas sales of $3.7 million per year and NFI subsequently acquired the properties for $3 million instead of $8 million.

101.    Petro has not been able to identify any economical infield drilling opportunities and no new wells were permitted at the time Regent acquired the acreage.

102.    Only one new well, the Robinson #4, has been drilled on the property.  The Robinson #4 was drilled after Defendants brought in their recommended geology consultant who predicted that this well could have an initial production of 68-71 barrels of oil a day and average 30 barrels of oil per day for the first year. However, the consultant was provided with only limited data with which to conduct the analysis as Defendants had not produced the diligence on the field that had been expected by Met13 and promised by Regent.

103.    Petro discovered that Wise had fabricated results for the Robinson #4 well, overstating production dramatically. The Robinson #4 is currently producing

less than one barrel of oil per day with a total production to date of less than 200 barrels, an insufficient amount to recoup the cost of drilling the well in any reasonable amount of time.

104.    Petro examined the Robinson #4 and determined that the well should not have been drilled and that a competent operator should have known a well in this location was not economically viable.

105.    Annual production revenue for the Shallow Operation is currently running at less than $400,000. Although Petro is working to minimize costs, the current best case scenario is for the business, as it exists today, to break even, not taking into account extraordinary costs relating to plugging lost, abandoned and underperforming wells.

106.    Stephenson has since taken over management of Regent's oversight of this investment from Field and is the representative of Regent dealing with Reed.

107.    Metropolitan raised other monies (a total of $38 million) to finance efforts to salvage the investment.   Plaintiff and the class members, however, have brought this lawsuit to recover their initial investment and the $3 million it will take to plug the worthless wells they now own.

**The Plaintiffs' and Class Members Losses Due To Defendants' Misconduct**

108.    In reliance on the fraudulent misrepresentations and omissions set forth above, identifiable class members initially lost $23,430,000.00 invested in Met13, with virtually no hope of recouping any of their investment.

109.    In addition, plaintiffs and class members may face litigation in the future involving the costs associated with plugging the worthless wells with estimates for plugging the unprofitable wells ranging from $2.5 to $3 million.

### FIRST CAUSE OF ACTION FRAUDULENT MIS-REPRESENTATION AND CONCEALMENT

110.    Plaintiffs and the class members repeat the averments of Paragraphs 1 through 109 above the same as if set forth at length herein.

111.    Field had authority to speak on behalf of Regent by virtue of his position as a co- managing director and the description of his role and duties on Regent's website, as well as Field's representation that he was Stephenson's "partner."

112.    Field had actual and apparent authority to speak on behalf the other Defendants.

113.    Defendants, therefore, willfully and intentionally made the following material misrepresentations of fact to Metropolitan and/or Met13 investors intending them to act in reliance on the misrepresentations and having reason to expect that they would act in reliance on them and that Metropolitan would convey the information to all of the investors to induce them to invest:

(a)    That Regent had sufficient expertise in oil and gas, either itself or through Premier, to be able to determine that the Shallow Operation was capable of earning $10 -20 million of EBITDA per year;

(b)    That Regent and Premier had sufficient expertise in oil and gas to know that the Deep Rights were worth substantially more than the cost and expense to acquire them;

24

(c)     That acreage the Defendants recommended buying was "scarce acreage" that could be resold at a significant profit;

(d)     That Defendants were capable of identifying, securing contracts with and providing formal oversight of top tier providers who could very profitably manage the Shallow Operation;

(e)     That Defendants, including Regent and Premier, would provide formal oversight and very profitable management of the Shallow Operation;

(f)     That Defendants had relationships with oil and gas companies that they knew to have an interest in acquiring the Deep Rights;

(g)     That the Deep Rights could be sold for substantially more than their acquisition costs, including the cost of capital;

(h)     That Defendants were able to provide to Metropolitan, Met13, and the class members the experience and expertise in oil and gas of Premier in connection with the Shallow Operation and the acquisition of the Deep Rights;

(i)     That the "redacted" Bayswater Report emailed by Lawrence Field to Metropolitan from Regent's email account was an accurate summary of Bayswater's evaluation of the acreage;

(j)     That Bayswater had decided not to manage the Shallow Operation because of Metropolitan's cost of capital and not because of well-grounded doubts about the viability of the Shallow Operation;

(k)     That Defendants had performed due diligence on the Shallow Operation and Deep Rights; and

(l)     That Defendants were familiar with Wise and that he was a capable operator of oil and gas assets.

114.    The representations made by Field on behalf of the Defendants to Metropolitan with the intent and full knowledge that they would be passed on to potential investors (Plaintiffs and class members) were, in fact, false and untrue and misleading.

115.    Defendants knew them to be false and willfully, wantonly and to the detriment of plaintiffs and class members, recklessly disregarded whether the representations were false and misleading.

116.    In addition to the material misrepresentations set forth above, Field and the defendants also, with the intent to defraud, concealed portions of the Bayswater diligence report that would have revealed problems with the Shallow Operation and revealed the Defendants' falsehoods.

117.    Plaintiffs and class members reasonably relied on the misrepresentations and omissions of the Defendants as set forth in this complaint and, had they known of the negative diligence in the Bayswater report and the Defendants' lies, they never would have invested in Met13.

118.    Met13, through its entities, acquired the Shallow Operation in reasonable reliance on the fact that the Bayswater diligence report had been fully and accurately provided to it.

119.    As a result of plaintiffs' and the class members justifiable reliance on the material misrepresentations knowingly made by the Defendants, they have suffered damages of not less than $23,430,000 in monies they invested and now face a

bill of approximately $2.5 to $3 million to plug unproductive wells and clean up the played out oil field.

120.    In addition, Field, on behalf of Defendants, acted with a high degree of moral turpitude, with recklessness, wanton dishonesty, and actual malice, and with the intent to solely benefit himself and the Defendants, therefore entitling Plaintiffs to an award of substantial punitive damages.

## SECOND CAUSE OF ACTION NEGLIGENT SUPERVISION

### (as against Stephenson)

121.    Plaintiffs repeat all the above averments in paragraphs 1-120 as if set forth at length herein.

122.    As the individual responsible for overseeing the management  of Regent and Premier and their investment activities, Stephenson owed third parties who had business dealings with Field a duty to supervise Field so that Field did not engage in fraud.

123.    On information and belief, Stephenson knew of Field's propensity to over-tout, over-sell, and lie about investment opportunities.

124.    On information and belief, Stephenson knew or should have known that Regent and Metropolitan had had business dealings in the past and that Regent and Field were pressing the worthless oil and gas opportunity on Metropolitan.

125.    Most of the above-alleged misrepresentations detailed in this complaint made by Field were made by him on the premises of Regent and Premier and/or utilizing the property and communication equipment of Regent and Premier

thereby making all of the defendants liable to plaintiffs and class members for all their losses.

### THIRD CAUSE OF ACTION, BREACH OF FIDUCIARY DUTY

126.   Plaintiffs and class members repeat the averments of Paragraphs 1 - 125 above the same as if set forth at length herein.

127.   Regent, Premier, Field and Stephenson had superior knowledge of material information about the Shallow Operation and the Deep Rights that was purposefully withheld from Metropolitan , Met13, Reed,  plaintiffs, and class members; especially the redacted negative material from the Bayswater diligence report, but also, on information and belief, the true nature of the Shallow Operation and Deep Rights.

128.   Metropolitan, Plaintiffs, and class members reposed confidence in the Defendants, trusted them to use their best efforts to safeguard their investments, and reasonably relied on their superior experience and expertise and the information that later turned out to be false/fraudulent.

129.   The Defendants thereby, negligently and recklessly exercised control and dominion over their enterprise/offering breaching their fiduciary duty to Met13 and its investors.

### FOURTH CAUSE OF ACTION- FRAUD

130.   Plaintiffs and class members repeat the averments in Paragraphs 1-128 above as if set forth at length herein.

131.   Defendants routinely provided false and misleading information directly to plaintiffs and class members and to Metropolitan, knowing it would be transmitted to plaintiffs and class members, in order to get plaintiffs and class members

28

to invest in their scheme and plaintiffs and class members did in fact rely on the false and misleading information when they invested in the fraudulent enterprise.

## FIFTH CAUSE OF ACTION-WIRE FRAUD

132.   Plaintiffs and class members repeat all of the above averments in paragraphs 1-131 as if set forth at length herein.

133.   On multiple occasions, Lawrence Field on behalf of the other Defendants utilized direct telephone calls and emails to convey fraudulent information to Metropolitan, some of the Plaintiffs, and other class members with the intention of having them rely on the fraudulent information.

134.   Metropolitan, the Plaintiffs, and class members reasonably relied on the fraudulent information and as a result suffered the losses set forth in this Complaint. The false information was the proximate cause of Plaintiffs' and the class members' losses.

## CLASS ACTION ALLEGATIONS

### A.    Definition

135.   Plaintiffs bring this action on behalf of Plaintiffs and all others similarly situated, being the Proposed Class Members, who invested in Met13.

136.   The Proposed Class of all other persons similarly situated, including Plaintiffs, is the 57 persons and entities who invested in Met13.

137.   The class members are geographically dispersed across the United States so as to make joinder extremely difficult.

**B.      Numerosity**

138.    Fifty seven persons and entities were adversely affected by Defendant's fraudulent conduct.

139.    The members of the Proposed Class are readily ascertainable, but are so numerous and widely dispersed that joinder is impractical.

140.    Plaintiffs are members of the Proposed Class and represent the same interests of the Proposed Class.

**C.      Common Questions of Law and Fact**

141.    There are questions of law and fact common to the class, including:

a.      Whether Defendants engaged in the conduct alleged herein;

b.      Whether Defendants' actions are in violation of common law;

c.      What state's common law should the Court apply to defendants' conduct;

d.      Whether the defendants violated federal wire fraud statutes;

e.      Whether the members of the Proposed Plaintiff Class have sustained damages, and what is the proper measure of damages;

f.      Whether Class members are exposed to future losses or expenses as a result of defendants' fraudulent conduct.

g.      Whether or not it is appropriate to enjoin Defendants' further transactions of this nature;

h.      Whether Defendants should have to pay punitive damages for their intentional illegal conduct;

i.      Whether the Defendants acted in concert with other entities to implement the fraudulent acts alleged herein; and

j.      Whether Defendants are liable for pre-judgment interest.

### D.      Typicality

142.    Plaintiffs' claims are typical of the claims of members of the Proposed Plaintiff Class in that Plaintiffs and the members of the proposed class have all suffered significant financial losses as a direct result of defendants' fraudulent conduct;

### E.      Adequate Representation

143.    Plaintiffs will fairly and adequately protect the interests of each member of the Proposed Class and have retained counsel competent and experienced in complex class action litigation and two of Plaintiffs' attorneys have already been found to have the requisite knowledge and experience in final orders approving other class action certifications/settlements.

### F.      Rule 23 Certification

144.    Class certification is appropriate because Proposed Class members have satisfied the requirements of Rule 23 since the prosecution of separate actions by or against individual members of the Proposed Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Proposed Class, which would establish incompatible standards of conduct for the Defendants.

145.    Class certification is appropriate because Proposed Class members have satisfied the requirements of Rule 23 since adjudication with respect to individual members of the class could, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or could substantially impair or impede their ability to protect their interests.

146.     Class   certification   is   appropriate   because   Proposed   Class members have satisfied the requirements of Rule 23 since the Defendants have acted or  refused  to  act  on  grounds  generally  applicable  to  the  Proposed  Class,  thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

147.     Class   certification   is   appropriate   because   Proposed   Class members have satisfied the requirements of Rule 23 since questions of law or fact common to the Proposed Plaintiff Class predominate over any questions affecting only individual members, and thus a class action is superior to any other available method for the fair and efficient adjudication of this controversy.

148.     Plaintiffs, as representatives of and on behalf of the Proposed Class, seek injunctive relief in the form of an Order requiring the Defendants to assume financial responsibility for the wells it fraudulently induced Met13 (class members) to purchase.

149.     Class certification of the Proposed Plaintiff Class is appropriate under Rule 23 because common issues of law and fact relative to the Defendant's conduct predominate over individual issues.

150.     A  Class  Action  is  superior  to  individual  litigation  because  the amount of money damages suffered by class members makes it likely that dozens of lawsuits would be filed by the individual victims and the Class Action device presents far fewer  management  difficulties  and  provides  the  benefits  of  unitary  adjudication, economies of scale, and comprehensive supervision in a single court of law.

WHEREFORE, Plaintiffs respectfully request relief and judgment from the Court and ask the Court to:

(a)   certify this matter as a plaintiff class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)   hold defendants jointly and severally liable for compensatory damages in favor of Plaintiffs and class members in an amount of $27,430,000;

(c)   hold defendants jointly and severally liable for punitive damages in favor of Plaintiffs and class members in an amount to be determined at trial;

(d)   award Plaintiffs and the class the costs and expenses of this action including, but not limited to, reasonable attorney fees, accountants' fees, and other expert witness fees and costs;

(e)   permanently enjoin Defendants from soliciting or accepting money from investors or participating in a venture that solicits or accepts money from investors;

(f)   award Plaintiffs and the class pre and post judgment interest on the $24, 430,000 invested in Met13;

(g)   award Plaintiffs post judgment interest on the $3,000,000 it will cost to cap oil wells and meet environmental regulations; and

(h)   award Plaintiffs and the class such other and further relief as this Court may deem just and proper.

This 2nd day of April, 2014.

s/ Richard L. Gaines
RICHARD L. GAINES, BPR # 15462
DANIEL, HARP & GAINES
550 Main Street, Suite 950
Knoxville, TN 37902
(865) 546-4292
(865) 546-4294 – Facsimile
richardlgaines@gmail.com


JAMES ANDREWS BPR# 15772
1405 Magnolia Ave.
Knoxville, TN 37917
(865) 660-3993
(865) 523-0995 – Facsimile
andrewsesq@icx.net


KARL SCHLEDWITZ BPR# 005972
930 South White Station
Memphis, TN
(901) 355-5759
(901) 259-6671
karl@monogramfoods.com

*Attorneys for Plaintiffs*


## COST BOND

I hereby certify myself as surety for the costs of this matter.


s/ Richard L. Gaines