UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| DNV Investment Partnership, Dale Menard, | ) | |
| S. Eugene Mathis, Jr.,  Kenneth A Grinspun, | ) | |
| Addison Holdings LLC, and Context Direct II, LP, | ) | |
| on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| Plaintiffs, | ) | No. 2:14-cv-02232-SHM-tmp |
| | ) | |
| vs. | ) | CLASS ACTION |
| | ) | JURY DEMAND |
| SGM Holdings, LLC, | ) | |
| Syndicated Geo Management Corporation, | ) | |
| Richard Featherly, | ) | |
| Lawrence Field, and | ) | |
| Premier Natural Resources, LLC, | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT FOR FRAUD IN THE INDUCEMENT, RICO VIOLATIONS, AIDING AND ABETTING RICO VIOLATIONS, AND CONSPIRACY**

Plaintiffs, on behalf of themselves and all other similarly situated investors/class members, by and through their below signed counsel, bring the following Second Amended Complaint against the Defendants, and respectfully allege as follows:

**NATURE OF THE ACTION**

In March of 2011, Syndicated Geo Management, LLC, (SGM) and its President, Richard Featherly, were facing deadlines for exercising options on oil and gas properties in Southern Ohio.  Rather than lose the money invested in the options, Mr. Featherly contacted Lawrence Field who forged a financial agreement between his company, the now defunct Regent Private Capital, LLC, (Regent) and SGM.  At the time, Regent was facing financial difficulties. Having formed an "Enterprise" to exploit the options, the Enterprise then went in search of capital.

Without disclosing that he had a financial relationship with SGM, Mr. Field approached Metropolitan GP Holdings, LLC, (Metropolitan) and its manager Paul Lisiak to raise money to exercise the options held by SGM. Throughout the events detailed in this Amended Complaint,

Mr. Field, on behalf of Regent and Premier, misrepresented himself as an "honest broker" utilizing the resources of Regent and Premier to perform due diligence on the Ohio oil and gas properties and leases.

Metropolitan had virtually no experience in oil and gas development and relied heavily on Mr. Field's "expertise." Mr. Field took an active role in helping Metropolitan raise capital for his and Mr. Featherly's Enterprise. The Enterprise redacted and altered "diligence" reports to make the properties and leases appear to be far better investments than they actually were. Mr. Field personally misrepresented and withheld material facts in telephone calls he made to many of the prospective investors from the offices of Premier.

## THE PARTIES

**Plaintiffs:**

1.      DNV Investment Partnership is a Tennessee entity with its principal place of business at 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.  All partners are residents of Tennessee and the Managing Partner is Justin Van Menard with a mailing address of 6401 Poplar Avenue, Suite 250, Memphis, TN 38119. The two members of DNC are natural persons who reside in Tennessee

**2.**      Kenneth A. Grinspun is a Tennessee resident with a mailing address of PO Box 38264 Germantown, TN  38183.

**3.**      S. Eugene Mathis, Jr. is a Tennessee resident with a mailing address of 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.

4.      Dale Menard, who invested through his IRA, is a Tennessee resident with a mailing address of 6401 Poplar Avenue, Suite 250, Memphis, TN 38119.

5.      Context Direct II, LP, 401 City Avenue, Suite 815, Bala Cynwyd, PA  19004.  Karen Batchelder is the managing partner.  The limited partners are natural persons, six of whom reside in Pennsylvania and one in New Jersey.

6.      Addison Holdings, LLC, is an Ohio entity with an address of 700l Post Road, Dublin, OH 43016.  The LLC is managed by James Frauenberg. The members are natural persons, one of whom is a resident of Utah and the other a resident of Florida.

**Defendants:**

7.      Defendant Lawrence Field was a founder and the managing director of the now-defunct Regent Private Capital, LLC, and one of the founders and principals in Premier Natural Resources, LLC, and, upon information and belief, is a resident of Oklahoma.

8.      Defendant Premier Natural Resources, LLC, is an Oklahoma limited liability company with its principal place of business at 5727 S. Lewis Street, Tulsa, Oklahoma 74105. Upon information and belief, one member is a natural person residing in Texas and the remaining members are natural persons residing in Oklahoma.

9.      Defendant Richard Featherley is a Michigan resident and the managing director of SGM Holdings, LLC. Upon information and belief, he is also the President of Syndicated Geo Management, Inc.

10.     Defendant, SGM Holdings LLC, d/b/a Syndicated Geo Management, Inc., ("SGM") is a Delaware limited liability company having its principal place of business located at 3075 Charlevoix Drive, Suite 175, Grand Rapids, MI 49546. Upon information and belief, its members are all natural persons who reside in Michigan.

11.     Defendant, Syndicated Geo Management Corporation, d/b/a Syndicated Geo Management, Inc., is a Delaware corporation that may be served through its Registered Agent,

Spiegel & Utrera, P.A., 9 East Loockerman Street, Suite 3A, Dover, DE, 19901.  Richard

Featherly is the President.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to (1) 28 U.S.C §1332(a) as

Plaintiffs' claims exceed $75,000 and the residences of Plaintiffs are diverse from Defendants;

(2) the Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711−1715

because the amount in controversy exceeds $5 million and there is diversity among more than

two thirds of the plaintiff class members and the defendants, and (3) 28 U.S. Code § 1367 -

Supplemental jurisdiction and (4) The Racketeer Influenced and Corrupt Organizations Act, 28

U.S. Code § 1961, et seq,

13.     Venue is appropriate in this District, because the Defendants had fraudulent, misleading,

and material telephone conversations with named Defendants who are now and were at the time

located in Tennessee and Tennessee's long-arm statute confers jurisdiction and venue on

Tennessee courts.  In addition, named Plaintiffs and putative class members are widely dispersed

so as to make it impossible to find a venue in which all or even a majority of victims and

Defendants are located.

## FACTUAL BACKGROUND

14.     On or about at least April of 2011, Syndicated Geo Management, Inc. and its President,

Richard Featherly, needed financing in order to exercise options it owned through a subsidiary,

SGM Holdings, LLC (SGM) on oil and gas properties in Southern Ohio.  Without outside

financing the options would expire and they would lose the options.

15.     Featherly contacted Lawrence Field at Regent Private Capital, LLC, (Regent) in order to

gain Mr. Field's and Regent's assistance in obtaining the needed financing.

16.     On March 1, 2011, Mr. Field, on behalf of Regent, and Mr. Featherly, on behalf of Syndicated Geo Management, Inc. and SGM, entered into a formal financial agreement to develop the oil and gas properties encompassed by the options. *See, Attachment A, Agreement dated March 1, 2011, between Regent and Syndicated Geo Management, Inc.*

17.     In the above agreement, Mr. Field invoked his close affiliation with Premier as a means of bolstering his experience and expertise. Premier is a private oil and gas exploration and production-company, that operates oil and gas wells in Louisiana, Mississippi, and Texas.

18.     Premier is a partner with Kohlberg Kravis Roberts & Co. L.P. ("KKR") in pursuing investments in North American oil and gas properties and Field used a supposed non-compete provision in the KKR partnership with Premier as an excuse for his "inability" to disclose relevant diligence documents to Metropolitan and class members.

19.     Regent and Premier share office space (including conference rooms) and a telephone system, and Field works out of those offices. Telephone calls from Regent's main telephone number were identified on "caller ID" as coming from Premier.

20.     Reed Energy, LLC and Reed Energy Exploration, Inc. (hereinafter, "Reed") were formed at the direction of Metropolitan Equity Partners, LLC ("Metropolitan") for the purpose of investing in the oil and gas drilling rights/operations, as described herein.

21.     Metropolitan is a New York City-based investment manager that provided investment advice and equity services to plaintiffs and class members.

22.     Metropolitan EIH13, L.P. ("Met13") is a Delaware limited partnership formed in 2011 by Metropolitan to solicit and facilitate plaintiffs' and class members' purchases of limited partnership interests in Met13. Metropolitan serves as the management company of Metl3.

23.     Reed is a majority-owned subsidary of Met 13 that was formed to exploit the oil and gas "opportunity" promoted by the Enterprise/Defendants.

24.     In reliance on false and incomplete information provided by the Defendants, Met13 solicited and received funds from Plaintiffs and class members it then used, in part, to make a secured first lien debt investment and purchase an equity interest in Reed, which is the entity that acquired some of the oil and gas drilling rights and operations described below. Other oil and gas drilling rights and operations described below were acquired by Reed's majority- owned subsidiary, Northeast Fuel, Inc. (NFI).

25.     Field and Featherly had numerous opportunities to disclose their financial agreement/relationship to Metropolitan and potential investors prior to Plaintiffs and class members investing in Met 13. Instead, they maintained the fiction that they were dealing with one another at arm's length.

## THE FRAUD BASED "OPPORTUNITY"

26.     In 2009, SGM Holdings, LLC ("SGM"), an entity formed by Syndicated Geo Management, Inc., obtained an option in what was purported to be 171 shallow gas wells (the "Shallow Operation") in Washington, Meigs, and Galia Counties in Ohio from Bobby Anderson and his wife, Marjorie Anderson (the "Andersons").

27.     After two years of failed attempts, SGM (and its predecessor) were unable to raise the capital necessary to exercise the option and develop and work the Shallow Operation.

28.     In 2011, SGM approached Regent to solicit the necessary capital to complete the project. SGM and Regent entered into an agreement (Attachment A) that gave Regent a share of the value of the oil and gas properties covered by the options if Regent was successful in raising the capital to exercise the options. The Agreement, which references Premier, is on Regent

letterhead, dated March 1, 2011 and is signed by Lawrence Field as the Managing Director of Regent.

29.     The above agreement memorializes an "Enterprise" as that term is defined in the RICO statute.

30.     Instead of investing its own capital, the Defendants/Enterprise, through Lawrence Field, approached and suggested to Metropolitan that it raise the capital to invest in the Shallow Operation. Field approached Metropolitan and described the proposed venture as an opportunity to acquire shallow gas and oil wells that had not been adequately maintained and exploited due to the death of the former owner's son 10 - 15 years earlier. Field/Defendants/Enterprise further represented that, with a strategic investment of new capital in the Shallow Operation, it could produce $10 - 20 million of EBITDA (earnings before interest, taxes, depreciation, and amortization) per year, according to diligence and calculations made by Regent in reliance on "the technical resources, employees and expertise of Premier."

31.     Regent does not employ any oil and gas experts, petroleum engineers or geologists, but Field said that he/Regent was accessing competent resources from Premier, which Field represented was controlled by his father-in-law, Charles Stephenson, and him, just as Regent was controlled by Stephenson and him.

32.     Without disclosing his obvious conflict of interest as a partner in the Enterprise, Field convinced Metropolitan that, separately, an investor could also acquire rights to the oil and gas in the Utica Shale, below the Shallow Operation (the "Deep Rights") and that the Deep Rights could be resold almost immediately, through Regent, using its and Premier's contacts/and relationships, for a significant profit over and above the initial investment.

33.     Field convinced Metropolitan that he/Regent/Premier would (a) attract and provide formal oversight of top-tier service providers who could maximize cash flow from the Shallow Operation and (b) attract top-tier purchasers for a quick sale of the Deep Rights. Field spoke frequently of the many relationships he had with high level persons at major oil and gas companies and said he was personally acquainted with potential buyers of the Deep Rights who would have a strong interest in acquiring them.

34.     Field, on behalf of the Enterprise, portrayed himself and Regent as uniquely able to bring this promised package together with his significant experience, expertise, and relationships throughout the oil and gas industry.  Field routinely spoke and wrote emails utilizing "we" and "our" in contexts where it was plain that he was referring not just to Regent, but also to Premier. These misrepresentations were made to Metropolitan and directly to plaintiffs and class members in meetings, emails, and phone calls.

35.     Field repeatedly spoke of the success of Premier, describing Premier as part and parcel of the Regent team and as a separate entity in name only. These representations were made to Metropolitan and directly to class members in meetings, emails, and phone calls.

36.     Field alleged that Regent, Premier, and he were precluded from investing in the opportunity presented by SGM because of the partnership between Premier and KKR or the Defendants would have invested in the combination of the Shallow Operation and Deep Rights themselves. At the time he made these statements, Field knew them to be false because of his and Regent's undisclosed "stake in the venture," as evidenced by an agreement between Regent and Featherly/SGM. *Attachment A, supra.*

37.     Metropolitan, plaintiffs, and class members reasonably believed and relied upon Field's representations that he had the authority to speak on behalf of Regent and Premier. Metropolitan,

plaintiffs, and class members also relied on Field's status as an "honest broker" and his "honest advice" in making decisions regarding the venture.  They relied on Field's assurances that he could deliver Regent's and Premier's expertise, experience and relationships in support of the venture.

38.      Metropolitan, plaintiffs, and class members reasonably believed that Field had the authority to speak on behalf of Premier based on Field's statements to that effect and his numerous representations that he attended meetings with KKR and other entities associated with Premier. He also shared offices, telephone system and ownership of Regent and Premier. Field demonstrated significant personal knowledge of Premier activities, disclosing confidential details of future Premier acquisitions which later proved accurate according to published transaction details.

39.      Field intentionally and fraudulently misled Metropolitan and Met13 investors to believe that Premier's expertise, experience, and relationships in the oil and gas industry had been used to complete the diligence on the Met13 venture and would be available to Metropolitan and its investors.

40.      Given its lack of experience with oil and gas, Metropolitan would not have even considered promoting the venture to the plaintiffs and class members had it known of the Field's and Regent's undisclosed "stake in the venture" it was promoting and absent the repeated assurances by Field that Premier, trusted by KKR, would also be assisting Metropolitan on Met13, Metropolitan's first oil and gas venture.

41.      Field told Metropolitan that all that was required for financial success in the Shallow Operation was the capital, to be raised by Metropolitan, and the experience, expertise, resources, and assistance of Regent and Premier.  Further, Field represented that they would provide the oil

and gas knowledge needed to sell Met13 securities directly to investors (plaintiffs and class members).

42.     In promoting the Deep Rights, Field represented, on behalf of the Enterprise, that all that was required for a successful investment were the pre-qualified buyers with whom Regent, Premier, and Field, had existing relationships.  He described the Deep Rights as comparable to other acreage in the Utica Shale valued at a materially higher price. According to Field, the sale of the Deep Rights could easily be concluded with a personal call from Field or his father-in-law, Stephenson, to a handful of reputable oil and gas exploration and production companies.

**FRAUDULENT EDITING OF THE BAYSWATER DILIGENCE REPORT**

43.     In June 2011, Regent, on behalf of the Enterprise, arranged for Metropolitan to tour the Ohio property in the company of Bayswater Exploration and Production ("Bayswater").

44.     Regent, on behalf of the Enterprise, recommended that Bayswater operate and manage the development of the Shallow Operation and represented that Bayswater was willing to participate in the venture.

45.     Given Bayswater's stature and acknowledged expertise in the oil and gas industry, its willingness to assume the management of the Shallow Operation was a major selling point for Met13.

46.     Based on its diligence and its negative assessment of the properties, Bayswater elected not to participate in the project. It also made clear in its "diligence" report that further diligence needed to be completed on the proposed project.

47.     Field and Featherly knew that Bayswater walked away from the project because of its well-founded doubts about the financial success of the project, but Field fraudulently told Metropolitan that Bayswater walked away because Metropolitan's cost of capital was too high.

48.     Field, on behalf of the Enterprise, also told Metropolitan that Bayswater wanted to do the project itself with its own resources, without Metropolitan, but that he "protected" Metropolitan and saved the deal for it.  Metropolitan relied, in part, on Bayswater's purported enthusiasm for the project in promoting the investment to the 57 limited partners/investors in Met13 (*see, Attachment B, List of Original Investors).*

49.     In fact, based on its tour of the property, Bayswater had written a diligence memorandum reporting not only the positives, but also the significant negatives it saw in the deal.

50.     On September 11, 2011, Field shared the Bayswater memorandum with Metropolitan but only after intentionally removing all negative analysis from it, including significant operational issues and other information highlighting the complexity of the operation and the inability to extract value from it.  The Enterprise, through Field, intentionally misled Metropolitan with the full knowledge that the fraudulent information would be passed on to and relied upon by the plaintiffs and class members. See, *Attachment C, The Redacted Bayswater Report with the Omitted Sections Highlighted.*

51.     Metropolitan thereafter generated a *Confidential Disclosure Memorandum* that contained the fraudulent information generated by Field on behalf of the Enterprise.  See, *Attachment D, Confidential Disclosure Memorandum.*  Based on the misinformation contained in the *Memorandum,* and the omissions due to the Defendants' fraud, Metropolitan raised $23,430,000 in capital from the Plaintiffs and other class members (Met 13) and expended this money purchasing and trying to manage the Ohio Properties.

52.     Each and every investor received and relied upon the *Confidential Disclosure Memorandum* in making the decision to invest in Met13.  Neither Metropolitan nor any investor knew about the contents of the full, un-redacted Bayswater memorandum until February, 2013.

53.     The negative information removed from the full Bayswater memorandum included:

- Issues relating to "casing leaks" on every wellbore in the deal;
- Quantification of abandonment costs for unproductive wells;
- The   lack of geologic information, mapping, cash flow information and identification of active vs. inactive wells;
- A "tremendous" lack of technical information, such that the upside cannot be de-risked through study/technical work"; and
- Data indicating that current cash flow from the assets did not justify significant asset value, and that the "existing deal structure... doesn't fit the asset and opportunity."

54.     Field, on behalf of the Enterprise, also removed a roadmap to further, more complete diligence that would be required in the event that Bayswater continued with the project.

55.     Plaintiffs and class members (and Metropolitan) would not have moved forward had they had access to the complete Bayswater memorandum. The Defendants'/Enterprise's fraudulent redacting of the Bayswater report and false assertions regarding the reason that Bayswater walked away from the venture were the proximate cause of Plaintiffs' and the class members' losses.  But for the Enterprise's fraudulent and deceptive conduct, there never would have been a Met13 limited partnership and none of the Plaintiffs or class members would have lost their investments.

56.     Field now claims that he doctored the Bayswater findings in response to a request from Metropolitan for a "headline summary" of the memorandum. However, a comparison of the full and edited memoranda makes plain that it was only the negative findings in the memorandum that Field, on behalf of the Enterprise, omitted. See *Attachment D, Email from Lawrence Field/Regent detailing only positive information from the Bayswater Diligence Report.*

**THE PROPOSED DEAL COMES TOGETHER**

57.     After Bayswater declined to participate, the project stalled for several months while the
Enterprise searched for a new operator.

58.     In the meantime, Chesapeake Energy Corporation ("Chesapeake"), the second largest gas
producer in the United States, entered into a joint venture in the Ohio Utica Shale. Field
portrayed the acreage that Chesapeake had acquired at $15,000/an acre as comparable to the
acreage he was offering Metropolitan and its investors at a much lower price.

59.     Field, on behalf of the Enterprise, had telephone conversations and met with many
potential investors in Met13 on several occasions in or around November and December 2011
and repeated to them the fraudulent representations already made to Metropolitan,  including
representations relating to Premier's relationship with KKR and why it precluded Regent and
Premier from doing the deal.  He also touted the quality and potential profitability of the
proposed investment.  At no time during these conversations with investors, did Field ever
disclose that he had a pre-existing financial interest that would only have value if Metropolitan
could raise the capital necessary to allow SGM to exercise the options on the Anderson shallow
operation.

60.     Field also read and approved of the Confidential Disclosure Memorandum  ("CDM") and
gave Power Point presentations and other misleading information to potential  investors that
referred to Regent as an "industry expert."  For example, the CDM stated:

> As of today, a small portion of the 171 producing wells are not fully functioning and the
> remainder are producing at sub-standard production levels due to a lack of ongoing
> investment in required capital expenditures and proper maintenance. While neglected ...
> diligence in conjunction with industry experts suggests that basic improvements may
> result in a material increase in current production. Further, the diligence suggests that
> there are unproven but probably unexploited reserves on the acreage.

61.     The industry experts referred to in this portion of the CDM are the family operations, Regent and Premier.

62.     Elsewhere in the CDM, Regent is specifically named as Metropolitan's "advisor on energy sector specific decisions." The CDM stated: "Regent will advise the Company prospectively on all energy sector specific decisions, including the sale of the deep drilling rights."  Metropolitan did not know of and the CDM did not disclose the fact that Field, on behalf of the Enterprise, had a financial incentive to "over-hype" the value and potential of the investment.

63.     By virtue of his access to the entire Bayswater Report, Field and the Enterprise knew that significant negative information critical to potential investors making informed decisions had been withheld from Metropolitan and consequently from potential investors.

64.     Metropolitan committed to raising the capital to acquire and invest in the Shallow Operation and to purchase and hold, pending resale, the Deep Rights. Metropolitan created Met13, Reed Energy and Northeast Fuels, Inc. (NFI) as vehicles to carry out this two-pronged investment strategy.  Reed acquired the Deep Rights and NFI acquired the Shallow Operation, both in reliance on the Defendants/Enterprise's misrepresentations and omissions that included:

        (a)     With the investment of a relatively small amount of money to develop its potential, the Shallow Operation would produce consistent and substantial monthly EBIDTA (earnings before interest, depreciation, taxes, and amortization);

        (b)     The Defendants/Enterprise had identified a capable operator who could manage the Shallow Operation and deliver the promised result;

        (c)     The Defendants/Enterprise would oversee development and management of the Shallow Operation;

(d)    The Deep Rights in the Utica Shale underlying the Shallow Operation could be obtained for a price substantially below its actual value and almost immediately sold at a higher price to buyers known to Regent/Premier and already waiting in the wings;

(e)    The value of the Deep Rights  could  be maximized if they were actually acquired by Reed and then sold in a "principal to principal" transaction, as opposed to simply "flipping" the Deep Rights Option Agreement, hence the need for and value in the money raised by Metropolitan from its investors; and

(f)    Defendants had already completed the diligence on the Deep Rights that would support the recommended investment.

(g)    That, by virtue of the negative information withheld from Metropolitan, there were no significant negatives associated with the investment.

## THE DEFENDANTS' SECRET FEE AGREEMENT/PARTNERSHIP

65.    On January 4, 2012, Reed and Regent entered into the Regent Fee Agreement, pursuant to which Reed agreed to pay to Regent an aggregate of $1 million (the "Consulting Fee") in connection with services rendered by Regent relating to the transactions contemplated by the Mineral Rights Option Agreements.  At the time it entered into this agreement, Reed (Metropolitan) still did not know of the Defendants'/Enterprise's undisclosed agreement and Regent/Field's obvious conflict of interest.  *Attachment A, supra.*

66.    The first $500,000 of the Consulting Fee was payable upon the acquisition by Reed of the Deep Rights, with the first payment due upon the acquisition of 3,000 acres of  Deep Rights and the remainder to be paid pro-rata as Reed acquired the first of 7,000 acres of additional Deep Rights.

67.     The second $500,000 of the Consulting Fee was to be paid to Regent, on a contingent

basis, upon the sale of at least 3,000 acres of the Deep Rights to an unaffiliated third party if

Regent was the procuring cause of such sale and the sale occurred at a price equal to or greater

than $4,000 an acre.

68.     In conjunction with the Consulting Fee, Reed also sold to Regent a highly discounted six

percent fully-diluted equity interest in Reed (which was netted against the Consulting Fee).

69.     It was Field who first used the term "arbitrage," in conjunction with the Deep Rights to

signify a quick sale at a substantial premium over the purchase price. Field used and approved

the use of the word in presentations and briefings to investors. Indeed, the concept of an

"arbitrage" was a fundamental theme of all discussions between Field, on behalf of the

Enterprise, and Metropolitan and Met13 investors.

70.     To date, Reed has paid to Regent $410,917 under the Regent Fee Agreement. Reed has

not paid Regent any additional monies for the reasons explained below.

## DISCOVERY OF THE FRAUDULENT MISREPRESENTATIONS

71.     The Enterprise's stated strategy for Reed's business model had two primary components.

The first component was to acquire up to 9,000 acres of leases in Washington, Athens, and

Meigs Counties and almost immediately resell them to a buyer, known to the Defendants, in a

"principal to principal" transaction (Field's words) without the use of any intermediary.

72.     The second component was to acquire about 6,000 acres of shallow rights and perform a

"traditional work-over of an old field" that would drive cash flow and enterprise value.

73.     With regard to the Deep Rights, Field said that Regent' and Premier's relationships would

not only open doors, but also maximize the price for the acreage. Field, on behalf of the

Enterprise, said that he could sell the land in the price range of $3,000 to $5,000 per acre in a

time frame of three to six months after the acquisition, false representations that Defendants, through Field, conveyed to Metropolitan and Metl3 investors.

74.    Field as a principal in the Enterprise agreed to (1) deliver diligence services for the acquisition of both the Shallow Operation and Deep Rights; (2) retain all the required expertise and hands-on operators to complete the project and oversee their work in connection with the Shallow Operation; and (3) deliver top-tier buyers in a matter of months for the Deep Rights.

75.    Reed accepted the above offer and agreed, in exchange, to enter into the Regent Fee Agreement and to sell Regent a six percent fully-diluted equity interest in Reed. Based on Field's representations and promises, Reed went forward with the purchase of the Deep Rights and NFI acquired the Shallow Operation.

**Defendants Do Not Do Any Diligence Work**

76.    In late 2011, Field told Metropolitan that Regent had utilized the resources of Premier to validate the assets that were the subject of the Mineral Rights Option Agreements, but that Metropolitan could not access the diligence performed by Regent/Premier to share with its investors as that might be construed as advertising the Premier relationship with KKR, which was forbidden by KKR.

77.    As Field and the other Defendants well knew, Metropolitan did not conduct comprehensive diligence to independently confirm the details of the purported Regent/Premier diligence, as it had no expertise to do so. Instead, Metropolitan relied upon the representations made and services provided by Defendants in exchange for the generous compensation provided under the Regent Fee Agreement.

78.    Instead of sharing with Metropolitan the Regent/Premier diligence which Field represented had been done, Field invoked the Premier/KKR relationship which he represented

required confidentiality and offered to, and did, speak directly to many of Metropolitan's investors, often by telephone, assuring them not only that the requisite due diligence on the assets had been successfully completed but also that the investment offered enormous potential for financial gain.

79.     Field appeared credible as he routinely pitched his ideas and understanding of the opportunity as not just his own, but the product of  Regent's and Premier's' significant expertise, experience, connections, and hard work and from knowledge gained by networking with potential buyers in the course of routine interactions with companies and individuals with which Premier had relationships. Field never mentioned his pre-existing financial relationship with Featherly/SGM.

80.     Defendants valued their "diligence" contribution at $2 million in a presentation Field made in May of 2011.  This false claim of a $2 million in kind investment was made with the intention of leading Metropolitan, Plaintiffs, and class members to invest and was a proximate cause of their losses.

81.     Unknown to Plaintiffs and class members, as well as Metropolitan, neither Regent nor Premier did any diligence work on the assets at issue in this lawsuit.

.     **The Deep Rights Acreage is Less Acreage than Regent Represented**

82.     Shortly after Reed acquired the option to purchase the Deep Rights and began to market them, it became apparent that Field was unable to bring any potential buyers to the table. In late March 2012, upon growing suspicion that Field, on behalf of the defendants, had been lying, Metropolitan asked Jason Henthorne, a Met13 investor and a trained geologist who has experience buying and selling oil and gas properties and is one of Metropolitan's appointments to the Reed board, to review the situation.

83.     At the time Henthorne began conducting geological due diligence on the Deep Rights, Reed had not yet acquired 5,347 of the 9,000 optioned acres. Based on Henthorne's work, Reed determined that the 3,653 acres that had been acquired could not be profitably developed and, therefore, were substantially less marketable than Defendants represented. Henthorne also determined that 2,500 un-acquired acres in southern Washington, Meigs, and Athens Counties could not be profitably developed.  The remaining 2,847 un-acquired acres also could not be profitably developed and did not even present clear title.

84.     As a result of Henthorne's work, Reed successfully avoided purchasing many acres which Reed would have been unable to re-sell because there is no hope that they will be profitable.

85.     Unfortunately, Reed had already purchased 3,653 acres of Deep Rights when it learned that the Deep Rights, which Regent and Field had said could be quickly sold at a premium to buyers waiting in the wings, were essentially worthless and illiquid.

86.     In fact, The Defendants have not produced a single potential buyer for the Deep Rights. The best they have been able to do is to produce a list of energy companies identified through the kind of internet search anyone could do.

87.     With no assistance from Defendants and in an attempt to mitigate further harm, Reed has itself been actively pursuing the sale of the Deep Rights through a reputable publically traded investment bank.

88.     Most buyers view the Deep Rights geology (and Southern Washington County, in general) to be "unproven," "thinning too rapidly," or "outside of the prospective Utica/Point Pleasant play," facts that would have become apparent to the Defendants had they done even cursory due diligence on the deep rights, let alone the "$2 million in diligence" they fraudulently claimed to have done.

89.     The acreage touted so enthusiastically by Defendants is actually south of the main Utica Shale play and not considered part of that development.

### THE SHALLOW WELLS ARE MOSTLY ABANDONED, NONPRODUCTIVE, OR PRODUCING BELOW EXPECTATIONS

90.     The Met13 Loan Agreement, pursuant to which Reed was lent $17 million to acquire and begin to develop the Shallow Operation, as well as Met13 investor documents, required a development plan and budget for the Shallow Operation  to be prepared prior to closing.

91.     Defendants delivered a written development plan and budget in March 2011 which Field represented was done in conjunction with someone knowledgeable in these types of operations: Larry Wise, who he said was experienced in oil production and improvement operations like those facing the shallow operation.

92.     However, it was not long after Wise took over managing the Shallow Operation that Reed began to suspect that he was not fit to run it. Wise failed to keep adequate records and spent unauthorized funds, and appeared to have inadequate knowledge of oil and gas operations.

93.     Reed asked Henthorne to review Wise's work in detail. Henthorne reported to Reed that he found Wise's work deficient and that he lacked local knowledge and a basic understanding of oil and gas operations.

94.     Defendants, through Field, disagreed with Henthorne, assuring Reed, both before and after Henthorne's review, that Wise had the requisite exploration and production skills and understood the business well and that he made multiple diligence trips to Ohio prior to the acquisitions and had adequate access to the former owners.

## THE MET13 ENTITIES TRY TO SALVAGE THE INVESTMENT

95.     Wise was never able to adequately manage the Shallow Operation and had to be terminated on December 3, 2012.  At that point, Henthorne's family-owned oil and gas business, Petro Evaluation  Services, LLC ("Petro"), took over control of the Shallow Operation.

96.     Petro discovered that of the 171 wells that Reed believed it was acquiring, 20 either cannot be found, as it appears they were abandoned decades earlier, or the leases have lapsed and the wells cannot be inspected.

97.     Of the remaining 151, 72 are not producing and Petro has concluded that they are not economically viable as the cost of bringing them back online exceeds any potential return from them. Another 49 wells are producing in such low quantities that the cost of running them exceeds what their current production yields.

98.     According to the Ohio Department of Natural Resources ("ODNR") regulations, these 141 wells must be plugged. The cost of plugging these wells will be about $2.5 - $3 million.

99.     The remaining wells are in poor condition, with minimal to no value in the equipment on location. With only a few exceptions, the production is very poor as most of the wells have either been in production for decades or possibly reworked to the point of exhaustion.

100.    The Defendants also represented that there were approximately 100 locations where new wells could be drilled within the acreage obtained from the Andersons. Regent represented that these new wells were already permitted. Per Defendants' fictional original diligence, the first 40 in-field wells were projected to generate over $13 million in EBITDA.  Prior to closing on the acreage, Regent redrafted its initial projections for the drilling of 10 new wells that would produce oil and gas sales of $3.7 million per year and NFI subsequently acquired the properties for $3 million instead of $8 million.

101.    Petro has not been able to identify any economical infield drilling opportunities and no new wells were permitted at the time Regent acquired the acreage.

102.    Only one new well, the Robinson #4, has been drilled on the property.  The Robinson #4 was drilled after Defendants brought in their recommended geology consultant who predicted that this well could have an initial production of 68-71 barrels of oil a day and average 30 barrels of oil per day for the first year. However, the consultant was provided with only limited data with which to conduct the analysis as Defendants had not produced the diligence on the field that had been expected by Met13 and promised by Regent.

103.    Petro discovered that Wise had fabricated results for the Robinson #4 well, overstating production dramatically. The Robinson #4 is currently producing less than one barrel of oil per day with a total production to date of less than 200 barrels, an insufficient amount to recoup the cost of drilling the well in any reasonable amount of time.

104.    Petro examined the Robinson #4 and determined that the well should not have been drilled and that a competent operator should have known a well in this location was not economically viable.

105.    Annual production revenue for the Shallow Operation is currently running at less than $400,000. Although Petro is working to minimize costs, the current best case scenario is for the business, as it exists today, to break even, not taking into account extraordinary costs relating to plugging lost, abandoned and underperforming wells.

106.    Prior to dissolving Regent, Charles Stephenson took over management of Regent's oversight of this investment from Field and, upon information and belief, is currently the Defendants' representative dealing with Reed.

107.     Metropolitan raised other monies (a total of $38 million) to finance efforts to salvage the investment.  Plaintiffs' investments have a junior position to the newer investments and there is little or no hope that Plaintiffs and the class members will ever receive even part of their "investments."  Plaintiffs and the class members have brought this lawsuit to recover their initial investments and the $3 million it will take to plug the worthless wells for which they now bear responsibility.

## LOSSES DUE TO THE DEFENDANTS'/ENTERPRISE'S MISCONDUCT

108.     In reliance on the fraudulent misrepresentations and omissions set forth above, identifiable class members have no hope of recovering the $23,430,000.00 invested in Met13.

109.     In addition, plaintiffs and class members may face litigation in the future involving the costs associated with plugging the worthless wells with estimates for plugging the unprofitable wells ranging from $2.5 to $3 million.

## THE "GLOBAL SETTLEMET AGREEMENT"

110.     In an attempt to salvage the venture Metropolitan raised additional capital to allow Reed to purchase additional mineral rights that could be sold at a profit.  SGM (the Defendants' partner in the undisclosed agreement, *Attachment A*), controlled half of the seats on Reed's Board of Directors.  SGM refused to permit these investments unless it was paid $1 million and Metropolitan agreed to a global settlement agreement releasing SGM and its affiliates from any liability.

111.     Metropolitan, under duress from Featherly/SGM on behalf of the Enterprise and with no knowledge that Field/Regent/Premier were "affiliates" of SGM in any sense of the word, signed the agreement.

### FIRST CAUSE OF ACTION FRAUDULENT MIS-REPRESENTATION
### AND CONCEALMENT AND FRAUD IN THE INDUCEMENT

112.    Plaintiffs and the class members repeat the averments of Paragraphs 1 through 111 above the same as if set forth at length herein.

113.    Field had authority to speak on behalf of Regent by virtue of his position as a co-managing director and the description of his role and duties on Regent's website, as well as Field's representation that he was Stephenson's "partner." He had the apparent authority to speak on behalf of Premier by virtue of his and "his family's" position as owners and his statements to that effect. Field and Regent shared office space with Premier and he had full use of Premier's office and communications equipment.

114.    Upon information and belief, as of the filing of this Amended Complaint, Premier has made no public announcement disassociating itself from Lawrence Field, Richard Featherly, or SGM.

115.    The principal Defendants aided and abetted by Premier, willfully and intentionally made the following material misrepresentations or omissions of material facts to Metropolitan and/or Met13 investors. They did so intending them to act in reliance on the misrepresentations and having reason to expect that they would act in reliance on them. The misrepresentations and omissions to Metropolitan were made with the knowledge that Metropolitan would convey the information to all of the investors to induce them to invest:

(a)    That Regent had sufficient expertise in oil and gas, either itself or through Premier, to be able to determine that the Shallow Operation was capable of earning $10 -20 million of EBITDA per year;

(c)    That Regent and Premier had sufficient expertise in oil and gas to know that the Deep Rights were worth substantially more than the cost and expense to acquire them;

(d)     That acreage the Defendants recommended buying was "scarce acreage" that could be resold at a significant profit;

(e)     That Defendants were capable of identifying, securing contracts with and providing formal oversight of top tier providers who could very profitably manage the Shallow Operation;

(f)     That Defendants, including Regent and Premier, would provide formal oversight and very profitable management of the Shallow Operation;

(g)     That Defendants had relationships with oil and gas companies that they knew to have an interest in acquiring the Deep Rights;

(h)     That the Deep Rights could be sold for substantially more than their acquisition costs, including the cost of capital;

(i)     That Defendants were able to provide to Metropolitan, Met13, and the class members the experience and expertise in oil and gas of Premier in connection with the Shallow Operation and the acquisition of the Deep Rights;

(j)     That the "redacted" Bayswater Report emailed by Lawrence Field to Metropolitan from Regent's email account was an accurate summary of Bayswater's evaluation of the acreage;

(k)     That Bayswater had decided not to manage the Shallow Operation because of Metropolitan's cost of capital and not because of well-grounded doubts about the viability of the Shallow Operation;

(l)     That Defendants had performed due diligence on the Shallow Operation and Deep Rights; and

(m)     That Defendants were familiar with Wise and that he was a capable operator of oil and gas assets.

116.    The representations and omissions made by Field on behalf of the Defendants/Enterprise to Metropolitan with the intent and full knowledge that they would be passed on to potential investors (Plaintiffs and class members) were, in fact, material, false, deceptive, untrue and misleading.

117.    The Defendants/Enterprise knew them to be false and willfully, wantonly and to the detriment of plaintiffs and class members, recklessly disregarded whether the representations were false and misleading.

118.    In addition to the material misrepresentations set forth above, Field and Featherly on behalf of the other Defendants/Enterprise also, with the intent to defraud, concealed their financial relationship and redacted portions of the Bayswater diligence report that would have revealed problems with the Shallow Operation and revealed the Defendants' false assurances about the value of the mineral rights.

119.    Plaintiffs and class members reasonably relied on the misrepresentations and omissions of the Defendants as set forth in this complaint and, had they known of the negative diligence in the Bayswater report and the undisclosed financial relationship between Featherly/SGM and Field/Regent (aided and abetted by Premier), they never would have invested in Met13.

120.    Met13 drafted its confidential offering and, through its entities, acquired the Shallow Operation in reasonable reliance on the fact that the Bayswater diligence report had been fully and accurately provided to it and that Field/Regent/Premier had been honest brokers in providing it with due diligence.

121.    As a result of Plaintiffs' and the class members justifiable reliance on the material misrepresentations knowingly made by the Defendants in furtherance of their Fraudulent Enterprise, they have suffered damages of not less than $23,430,000 in monies they invested and

now face a bill of approximately $2.5 to $3 million to plug unproductive wells and clean up the played out oil field.

122.     In addition, Field and Featherly, on behalf of all the Defendants, acted with a high degree of moral turpitude, with recklessness, wanton dishonesty, and actual malice, and with the intent to solely benefit themselves and the Enterprise, therefore entitling Plaintiffs to an award of substantial punitive damages including, but not limited to treble damages.

**SECOND CAUSE OF ACTION: VIOLATION OF THE RICO STATUTE**

123.     Plaintiffs repeat all the above averments in paragraphs 1-122 as if set forth at length herein.

124.     The RICO statute, The United States Code, Title 18, Section 1961 (1), in part, defines "racketeering activity" as (B) any act which is indictable under any of the following provisions of title 18, United States Code: …section 1343 (relating to wire fraud).

125.     Section 1961, further defines an "enterprise" for RICO purposes as: (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  "Pattern of Racketeering Activity" requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

126.     Through their activities as outlined above Lawrence Field/Regent and Richard Featherly/SGM formed an Enterprise as that term is defined in the RICO statute.

127.     Following the formation of the Enterprise, Lawrence Field/Regent and Richard Featherly/SGM violated the following sections of Title 18 U.S.C. §1962:

(b) It shall be unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity….

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection… (b), or (c) of this section.

128.    Premier is jointly and severally liable to the Plaintiffs and class members as it aided and abetted the other Defendants in the implementation and concealment of their fraudulent Enterprise.

129.    Each and every Plaintiff and class members was injured in that each one was induced either directly or indirectly to invest monies in Met 13 based on fraudulent actions by the Defendants.

130.    Plaintiffs specifically acknowledge that Metropolitan did not commit any fraudulent actions in the solicitation of funds for and the establishment of Met 13.

## CONSPIRACY

131.    Plaintiffs and the class members repeat the averments of Paragraphs 1 through 130 above the same as if set forth at length herein.

132.    As the individual responsible for overseeing the management of Regent and Premier and their investment activities, Stephenson owed third parties who had business dealings with Field a duty to supervise Field so that Field did not engage in fraud.

133.    On information and belief, Stephenson knew of Field's propensity to over-tout, over-sell, and lie about investment opportunities.

134.     On information and belief, Stephenson knew or should have known that Regent and Metropolitan had had business dealings in the past and that Regent and Field were pressing the worthless oil and gas opportunity on Metropolitan.

135.     Most of the above-alleged misrepresentations detailed in this complaint made by Field were made by him on the premises of Regent and Premier and/or utilizing the property and communication equipment of Regent and Premier thereby making all of the defendants liable to plaintiffs and class members for all their losses.

## CLASS ACTION ALLEGATIONS

### A.     Definition

136.     Plaintiffs bring this action on behalf of Plaintiffs and all others similarly situated, being the Proposed Class Members, who invested in Met13.

137.     The Proposed Class of all other persons similarly situated, including Plaintiffs, is made up of the 57 persons and entities who invested in Met13.

138.     The class members are geographically dispersed across the United States so as to make joinder extremely difficult..

### B.     Numerosity

139.     Fifty seven persons and entities were adversely affected by Defendant's fraudulent conduct.

140.     The members of the Proposed Class are readily ascertainable, but are so numerous and widely dispersed that joinder is impractical.

141.     Plaintiffs are members of the Proposed Class and represent the same interests of the Proposed Class.

### C.     Common Questions of Law and Fact

142.    There are questions of law and fact common to the class, including:

      a.    Whether Defendants engaged in the conduct alleged herein;

      b.    Whether Defendants' actions are in violation of common law;

      c.    What common law should the Court apply to Defendants' conduct;

      d.    Whether the Defendants violated federal wire fraud statutes;

      e.    Whether the members of the Proposed Plaintiff Class have sustained damages and what is the proper measure of damages;

      f.    Whether Class members are exposed to future losses or expenses as a result of Defendants' fraudulent conduct.

      g.    Whether or not it is appropriate to enjoin Defendants' further transactions of this nature;

      h.    Whether Defendants should have to pay punitive damages for their intentional illegal conduct;

      i.    Whether the Defendants acted in concert with other entities to implement the fraudulent acts alleged herein; and

      j.    Whether Defendants are liable for pre-judgment interest.

**D.    Typicality**

143.    Plaintiffs' claims are typical of the claims of members of the Proposed Plaintiff Class in that Plaintiffs and the members of the proposed class have all suffered significant financial losses as a direct result of Defendants' fraudulent conduct;

**E.    Adequate Representation**

144.    Plaintiffs will fairly and adequately protect the interests of each member of the Proposed Class and have retained counsel competent and experienced in complex class action litigation and two of Plaintiffs' attorneys have already been found to have the requisite knowledge and experience in final orders approving other class action certifications/settlements.

**F.    Rule 23 Certification**

145.    Class certification is appropriate because Proposed Class members have satisfied the requirements of Rule 23 since the prosecution of separate actions by or against individual members of the Proposed Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Proposed Class, which would establish incompatible standards of conduct for the Defendants.

146.    Class certification is appropriate because Proposed Class members have satisfied the requirements of Rule 23 since adjudication with respect to individual members of the class could, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or could substantially impair or impede their ability to protect their interests.

147.    Class certification is appropriate because Proposed Class members have satisfied the requirements of Rule 23 since the Defendants have acted or refused to act on grounds generally applicable to the Proposed Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

148.    Class certification is appropriate because Proposed Class members have satisfied the requirements of Rule 23 since questions of law or fact common to the Proposed Plaintiff Class predominate over any questions affecting only individual members, and thus a class action is superior to any other available method for the fair and efficient adjudication of this controversy.

149.    Plaintiffs, as representatives of and on behalf of the Proposed Class, seek injunctive relief in the form of an Order requiring the Defendants to assume financial responsibility for the wells it fraudulently induced Met13 (class members) to purchase.

150.    Class certification of the Proposed Plaintiff Class is appropriate under Rule 23 because common issues of law and fact relative to the Defendant's conduct predominate over individual issues.

151.    A Class Action is superior to individual litigation because the amount of money damages suffered by class members makes it likely that dozens of lawsuits would be filed by the individual victims and the Class Action device presents far fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision in a single court of law.

**WHEREFORE**, Plaintiffs respectfully request relief and judgment from the Court and ask the Court to:

(a)    certify this matter as a plaintiff class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)    hold Defendants jointly and severally liable for compensatory damages in favor of Plaintiffs and class members in an amount of $27,430,000;

(c)    hold Defendants jointly and severally liable for punitive damages in favor of Plaintiffs and class members in an amount to be determined at trial;

(d)    award Plaintiffs and the class the costs and expenses of this action including, but not limited to, reasonable attorney fees, accountants' fees, and other expert witness fees and costs;

(e)    permanently enjoin Defendants from soliciting or accepting money from investors or participating in a venture that solicits or accepts money from investors;

(f)    award Plaintiffs and the class pre and post judgment interest on the $24, 430,000 invested in Met13;

(g)    award Plaintiffs post judgment interest on the $3,000,000 it will cost to cap oil wells and meet environmental regulations; and

(h)     award Plaintiffs and the class such other and further relief as this Court may deem just and proper.

This 26th day of May 2014.

BY:     /s/ A. James Andrews_____
A. James Andrews BOPR# 15772
1405 Magnolia Ave.
Knoxville, TN 37917
(865) 660-3993
(865) 523-0995 – Facsimile
andrewsesq@icx.net

/s/ Karl Schledwitz_____
Karl Schledwitz, Esq
Attorney for Plaintiff .
930 South White Station
Memphis, TN
901-355-5759
karl@monogramfoods.com

/s/ Richard L. Gaines_____
Richard L. Gaines, BPR # 15462
550 Main Street, Suite 950
Knoxville, TN 37902
(865) 546-4292
(865) 546-4294 – Facsimile
richardlgaines@gmail.com

## COST BOND

I hereby certify myself as surety for the costs of this matter.

/s/ A. James Andrews
A. James Andrews

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amended Complaint was served upon counsel for the Defendants, who has agreed to accept service of the Second Amended Complaint, through the Court's electronic filing system.

/s/ A. James Andrews